UNITED STATES of America, Appellee,

v.

Gary Arthur TEAGUE, Appellant.

No. 83–5100.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 4, 1983.

Decided June 7, 1984.

Murnaghan, Circuit Judge, filed dissenting opinion.

J. Davis Connor, Charlotte, N.C., for appellant.

James Fitzner, Asheville, N.C. (Charles R. Brewer, U.S. Atty., Debra J. Stuart, Asst. U.S. Atty., Asheville, N.C., on brief), for appellee.

Before MURNAGHAN, SPROUSE and CHAPMAN, Circuit Judges.

CHAPMAN, Circuit Judge:

Indicted on two counts of violating 18 United States Code Appendix § 1202(a)(1), which makes it a crime for a felon to possess a firearm, Gary Arthur Teague appeals his conviction as to Count One. In a jury trial he was acquitted as to Count Two. He claims error by the trial judge in admitting into evidence an alleged possession of a firearm not mentioned in the indictment, admission of testimony as to illegal gun sales by one of his witnesses, and claims that his sixth and fourteenth amendment rights were violated by the assistant United States attorney in threatening and intimidating one of his main witnesses. Finding no merit in any of these exceptions, we affirm.

I

On April 17, 1975, Teague was convicted in the Superior Court of Gaston County, North Carolina of felonious breaking and entering. As a convicted felon he became subject to the federal restrictions as to possession of firearms. On June 8, 1978, Teague, being then a resident of North Carolina, went to a Western Auto Store in Clover, South Carolina with Henry Phillips, a South Carolina resident, and Larry Martin, a North Carolina resident and licensed gun dealer. Phillips testified that Teague asked him to buy a gun for Teague, since Teague was not a resident of South Carolina, but that Teague did not tell him that he was a convicted felon. According to Phillips, Teague picked out a .45 caliber Colt Commander pistol, serial number

70BS74237, which Phillips then purchased and filled out the 4473 form showing Phillips as the purchaser. Upon leaving the Western Auto Store, Phillips gave the gun to Teague.

On January 31, 1979, Teague was arrested by a Gaston County, North Carolina police officer for reckless and drunken driving. During the arrest the officer noticed a .45 caliber pistol on the floor of Teague's automobile. This was the same weapon purchased on June 8, 1978 and was delivered by the arresting officer to a deputy sheriff of Gaston County. The pistol was tagged for identification and retained by the evidence custodian at the Sheriff's Office. This possession of the firearm is the basis for the first count in the indictment.

Shortly thereafter, Teague contacted Phillips and asked him to go to the Sheriff's Office and claim the pistol. Teague had been to the Sheriff's Office and attempted to claim the weapon saying that it belonged to a friend. Since Teague did not claim to be the owner, the custodian would not deliver it to him, so Teague contacted Phillips. They went to the Western Auto Store in Clover and obtained a copy of the form showing Phillips to be the owner, and upon presentation of this form to the custodian the .45 caliber Colt automatic, bearing the same serial number mentioned above, was delivered to Phillips who immediately gave it to Teague. This occurred on May 21, 1979 and is the possession charged in the second count of the indictment.

Teague testified that he did not know the pistol was in his automobile at the time of his arrest, and that it must have been left there by Phillips, who had borrowed his car. However, Phillips denied ever borrowing Teague's car or the car of Teague's wife, or ever seeing the pistol after the day of its purchase until Teague asked him to retrieve it from the Sheriff's Office. North Carolina SBI agent Nelson testified that he was working in an undercover capacity with an ATF agent on April 17, 1980. While they were in Rick's Hideaway lounge, Teague offered to sell them a .45

caliber automatic for $300. Nelson testified that he saw the weapon in Teague's possession at the time. The agents did not have enough money to make the purchase at that time, but returned two days later and upon inquiry Teague advised that he had already sold the gun. The possession of April 17, 1980 is not covered in the indictment.

On the morning of the second day of trial, Teague's attorney advised the court that assistant United States attorney Stuart had threatened and intimidated his witness, Larry Martin. The court conducted a hearing on this claim, out of the jury's presence, and before proceeding further with the testimony. The evidence showed that after the first day of trial Mrs. Stuart, having become aware that Martin was going to be a defense witness called Don Bumgardner, Martin's attorney, and advised him that if Martin perjured himself he would be hearing from the United States Attorney's office and Martin's pretrial diversion agreement would be revoked. This information was passed along to Martin by his attorney, who advised that he could not be prosecuted for telling the truth, but if there was any way he could get out of testifying he should do so. The following morning prior to court, Martin on his own initiative sought out Mrs. Stuart. He had not been contacted by her or anyone from her office. She refused to discuss the matter with him, but told him that she was not trying to interfere with his testifying but he had better not perjure himself.

After the hearing, the court concluded that no one from the government had threatened Martin and he had only been admonished to testify truthfully. Martin did take the stand as a defense witness and testified that he, as a North Carolina gun dealer, had transferred the .45 Colt pistol to the Western Auto Store in Clover, South Carolina in order that it could be legally purchased by Phillips in South Carolina, and that it was purchased by Phillips for Phillips' personal use, and he did not see Phillips give it to Teague and had never

seen it in Teague's possession. He stated he had seen a large automatic pistol in Phillips' hand about three weeks after the purchase. He also testified: "At the time, Mr. Phillips was an awful bad alcoholic and was bad to take pills." Martin could give no testimony as to the events of January 31, 1979 or May 21, 1979, the possessions covered by the indictment, because he was not present when Teague was arrested nor when the pistol was reclaimed from the Sheriff's Office.

Each count of the indictment charges only possession, and not ownership, of the weapon. Teague was convicted only on Count One of knowingly possessing the .45 caliber Colt at the time of his traffic arrest on January 31, 1979. The testimony of Martin could not help him or hurt him on the issue of knowingly having possession, either actual or constructive at that time, because Teague was alone in the vehicle with the weapon.

## II

■ There was no error in the admission of the testimony of Special Agent Nelson of the North Carolina State Bureau of Investigation that defendant had offered to sell Croswell a .45 caliber Colt automatic for $300 at Rich's Hideaway Lounge on April 17, 1980 and the other testimony surrounding this incident. Prior to this line of questioning, the prosecuting attorney advised defense counsel and the court of the nature of the intended testimony and its purpose to show intent, knowledge and absence of mistake under Federal Evidence Rule 404(b). A voir dire examination of Agent Nelson was conducted outside the jury's presence and the court found this testimony admissible for the intended purpose and also found it more probative than prejudicial under Rule 403.

In addition, immediately after receipt of this testimony before the jury, the court gave an excellent charge instructing the jury that it could consider such testimony only in trying to determine the defendant's motive, intent, knowledge or state of mind and such testimony could not be considered

in determining whether the defendant committed the act or acts charged in the indictment. This is in keeping with this court's suggested procedure. See *U.S. v. Masters*, 622 F.2d 83, 87 (4th Cir.1980). This charge was also repeated in the final jury instructions.

## III

Appellant complains of the court allowing his witness Martin to be cross examined about alleged prior gun sales by Martin to the defendant through intermediaries. This testimony followed a bench conference at which the trial judge clearly explained that he had weighed the proposed line of questioning under Rule 403 and found it more probative than prejudicial and explained that it was coming in only for the purpose of impeaching the direct testimony of Martin that he had not seen the defendant in possession of a firearm since defendant's felony conviction. The evidence was also admitted to show possible bias of Martin.

■ The scope of permissible impeachment of a witness in a criminal trial generally is committed to the sound discretion of the trial court, which discretion must be exercised with due regard for the defendant's constitutional rights. *U.S. v. Dominguez*, 604 F.2d 304, 310 (4th Cir.1979). There has been no showing of an abuse of discretion in the present case or that the defendant's constitutional rights were in any way abridged by this cross examination of witness Martin.

## IV

■ Defendant claims that his due process rights were violated by the action of assistant United States attorney Stuart in calling the attorney for witness Martin and advising that if Martin perjured himself he would be hearing from the United States and his pretrial diversion agreement would be revoked. This is not the identical act that we condemned in *United States v. MacCloskey*, 682 F.2d 468, 479 (4th Cir. 1982), but it is similar, and since *MacClos-*

*key* was decided almost a year before the present action was tried, the United States Attorney's office should have been aware of it and refrained from making any unsolicited call to an attorney for a prospective witness to remind them of the consequences of perjury. Such calls are unnecessary because most witnesses in criminal cases are aware of the laws against false swearing. Such calls are also dangerous and foolish—dangerous because they can violate a defendant's due process right to present his defense witnesses freely, and foolish because of the warnings given by this court and others. *United States v. MacCloskey, supra., United States v. Morrison,* 535 F.2d 223 (3rd Cir.1976), *United States v. Hammond,* 598 F.2d 1008 (5th Cir.1979) and *United States v. Thomas,* 488 F.2d 334 (6th Cir.1973).[1]

In *MacCloskey* we left open the question of whether such a call or warning to a witness' attorney of the consequences of perjury could be harmless error. Under the particular facts in this case we find no prejudice to the defendant resulting from the call and therefore the action of the assistant United States attorney was harmless.

The trial judge was advised of what had happened and conducted a hearing, out of the jury's presence, at which the facts were thoroughly developed with testimony from Martin and statements from the assistant United States attorney and defense attorney. The court was satisfied that Martin had not been threatened by any federal agent or attorney. It is obvious to us from reading Martin's testimony that he did all he could to assist in Teague's defense. Martin testified that he had been a licensed gun dealer in North Carolina in June 1978 and had arranged to transfer the .45 caliber Colt automatic to the gun dealer in Clover, South Carolina so that it could be legally purchased by Phillips, who was a South Carolina resident. He swore Teague had no part in this transaction and never

owned or possessed this firearm. He tried to discredit Phillips' testimony by accusing him of drinking heavily during this time, and he testified that he had never seen defendant in possession of a firearm since defendant's felony conviction.

However, he could give no helpful testimony about Teague's possession of the weapon on January 31, 1979, the charge upon which he was convicted, because Teague was alone when arrested for driving under the influence and the weapon was in the vehicle with him.

The leading case on witness intimidation depriving a defendant of due process is *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) in which the court found that the action of the trial judge intimidated the only defense witness to such an extent that he was driven from the witness stand and did not testify for the defendant. The witness Leslie Mills had a prior criminal record and was then serving a prison sentence. The judge on his own initiative admonished the witness:

> Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the Grand Jury and you will be indicted for perjury and the liklihood [sic] is that you would get convicted of perjury and that it was be stacked on to what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you're going to have to serve. It will also be held against you in the pentitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you are taking by getting on the witness stand under oath. You may tell the truth and

---

**1.** Each of these cases resulted in a remand for a new trial because a defense witness was intimidated to the point that the witness did not testify or invoked the fifth amendment and testimony helpful to the defendant was not received.

if you do, that is all right, but if you lie you can get into real trouble. The Court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.

Defense counsel objected to these comments claiming they put the witness under such duress that he could not freely and voluntarily decide whether to testify and that the court had not admonished any of the State witnesses in a similar fashion. The Supreme Court found that the trial judge "effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the fourteenth amendment." *Id.* at 98, 93 S.Ct. at 353.

In *United States v. Morrison, supra,* the witness was the eighteen year old girlfriend of the defendant and had indicated she would testify that she was very much involved in the conspiracy and the defendant was not so involved. This witness was only seventeen years of age at the time of the indictment, and had originally been indicted with the defendant but the charges against her were dropped. She did not have an attorney representing her when the assistant United States attorney on three occasions sent word to her that if she testified her testimony *would* be used against her, that the charges against her could be reopened in either the state court or the federal court. The prosecutor then had her subpoenaed to his office by use of an illegal subpoena writ and in the presence of three law enforcement officers warned her that if she admitted any part in the conspiracy, she could be prosecuted. He also advised her as to perjury and of her right to take the fifth amendment and not testify. When she took the witness stand she invoked her fifth amendment privilege on many questions and refused to answer and give testimony beneficial to the defendant and deprived the defendant of

much of the evidence he had expected from her.

In *United States v. Hammond, supra,* the Fifth Circuit restated its rule that substantial government interference with a defense witness' free and unhampered choice to testify violates the due process rights of the defendant.[2] *Hammond* involved a warning that was given by an FBI agent to an important witness during a court recess, but while the witness was actually on the stand. The warning was to the effect that if the witness continued with his testimony he would have nothing but trouble in a Colorado state criminal case, then pending, of which the FBI agent was aware. The next morning this witness as well as another defense witness were subpoenaed before the grand jury to give testimony in a continuing investigation of the matter out of which the Hammond criminal case arose. Following this, the witness who had been on the stand, and the other witness, refused to testify and advised the trial judge that their fear of government reprisal in the Colorado case prompted their action.

In *United States v. Thomas, supra,* the witness Asaro had received a directed verdict of acquittal at the conclusion of the government's case and was the first witness called by the defendants. Counsel for one of the defendants advised Asaro that his testimony could lead to a prosecution for misprision of a felony and he should discuss his testimony with his attorney. The court then made an additional explanation of misprision of a felony and a short recess was called to allow Asaro to find his lawyer, who had left the courtroom after Asaro's directed verdict of acquittal. During this recess Asaro was approached by a Secret Service agent at the behest of the assistant United States attorney who told him that he *would* be prosecuted for misprision of a felony if he testified in the case. Thereafter Asaro refused to testify and the defendant was deprived of his testimony.

**2.** The rule was originally adopted in *United States v. Henricksen,* 564 F.2d 197 (5th Cir.1977) in which the government confessed error on appeal where the United States Attorney had made it a condition to a plea bargain of Henricksen's codefendant that he not testify at Hendricksen's trial.

In *United States v. MacCloskey, supra,* the United States attorney became aware during the trial that the defendants intended to call Patsey Edwards as a witness. He then called the attorney for Edwards and told him that "He would be well-advised to remind his client that, if she testified at MacCloskey's trial, she could be reindicted if she incriminated herself during that testimony. Thereafter a voir dire hearing was conducted and she testified out of the presence of the jury in a way completely exculpatory of both her and MacCloskey. When she was called as a witness she refused to answer many of the questions which she had answered in great detail at the voir dire and advised that she was invoking her fifth amendment privilege because she was afraid the indictment against her would not be dismissed. The defense motion to introduce the voir dire testimony pursuant to Rule 804 was denied. Edwards stated that her reason for invoking the fifth amendment was the warning of the United States attorney. MacCloskey was deprived of the important exculpatory testimony.

In the present case, Teague was not deprived of his witness' testimony and the transcript reflects that the witness Martin gave all of the favorable testimony that the defendant could have expected. There was no intimidation or threatening of the witness by the court as in *Webb.* There was no direct threat to Martin by any agent of the government as in *Hammond* and *Thomas* and no direct threats or harassment by the United States attorney as in *Morrison.* In each of the cases requiring reversal, the defendant was denied either all of the testimony of the intimidated witness or all of the helpful testimony from the witness. In the present case Teague got all of the helpful testimony from Martin that he had anticipated. Martin was not present at the time Teague was arrest-

ed on January 31, 1979, so he could not give any testimony about possession of the weapon which produced the conviction.

We do not feel that there should be a per se rule preventing any contact between the prosecutor and an attorney for a witness made in an effort to prevent perjury, and since no prejudice to the defendant resulted from the contact in this case, the judgment is

AFFIRMED.

MURNAGHAN, Circuit Judge, dissenting:

While I fully agree with the panel opinion insofar as it sanctions the admission of evidence regarding Teague's alleged possession of a firearm not mentioned in the indictment and of his prior gun purchases from Martin, I do not share the majority's view that the action of Assistant United States Attorney Stuart constituted no violation of Teague's due process rights.

In particular, I disagree with the majority's conclusion that Teague suffered no harm from the approach initiated by the prosecutor to Martin's attorney in a purported effort to guard against perjury.[1] While the majority would confine its analysis in this situation to a finding that Stuart's conduct was "dangerous and foolish," I would hold that her actions constituted a due process violation harmful to Teague in their interference with his presentation of witnesses in his defense.

I would thus emphasize the teaching of the Supreme Court in *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (per curiam), in which the Court reversed appellant's conviction and granted a new trial upon a finding that the trial judge "effectively drove [the sole defense] witness off the stand" by his extended admonitions issued *sua sponte* during a jury recess.[2] The witness' refusal even to take

---

1. It should be emphasized that Stuart's approach to counsel for Martin was simply an exhortation. It was not based on the availability of factual information in the Government's hands, unknown to the witness, which might

support a charge of perjury if contradictory evidence were forthcoming.

2. The trial judge told the witness, "[A]nything you say can and will be used against you .... You don't owe anybody anything to testify and

the stand was deemed by a majority of the Court to constitute a due process violation, insofar as appellant was denied the right to present witnesses to establish his own defense. Quoting from *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967), the Court reiterated that the right to present witnesses "is a fundamental element of due process of law." 409 U.S. at 98, 93 S.Ct. at 353.

This Court has likewise recognized the fundamental nature of the right, and has granted a new trial when governmental overbearing undermined the unfettered choice of a defense witness to testify freely. In *United States v. MacCloskey*, 682 F.2d 468 (4th Cir.1982), the United States Attorney prosecuting the case made, on the second day of trial, a call to counsel for a key defense witness, who herself had originally been indicted with the defendant. Specifically, the United States Attorney suggested that the witness would be well advised to invoke her fifth amendment privilege should she choose to take the stand, and that she could be reindicted if she incriminated herself.[3]

As a result, in *MacCloskey*, when the witness took the stand, she claimed the fifth amendment privilege some thirty times. She thereby refused to answer certain questions before the jury that she had answered fully and in a completely exculpatory fashion for the defendant during her prior *voir dire*. Finding reversible error and granting a new trial, the Court observed:

> [She] was the primary defense witness. The testimony she gave in the first *voir dire* was detailed and contradicted, or offered innocent explanations to, [other] damaging testimony. In short, her *detailed* testimony was vital to [the] de-

fense. Since the evidence against [the defendant] was not overwhelming ... we are unable to say that the error was harmless.

*Id.* at 479 (emphasis original).

Teague's case is quite similar to that of the defendant in *MacCloskey*, presenting an instance of gratuitous prosecutorial admonitions that were devoid of factual justification of any kind. Moreover, the evidence against Teague, like that against the defendant in *MacCloskey*, was, to my mind, "not overwhelming." Thus, Stuart's error cannot be deemed harmless. It is true that Martin's counsel believed that Stuart's real concern was that Martin should be admonished to testify in a truthful manner, and that at no time did Stuart try to influence counsel to have Martin testify in a particular way. Nonetheless, her communications first to counsel, then to Martin himself on the day he testified, left no doubt that "she expected completely truthful testimony ... and that a failure to testify truthfully ... would result in a review of [Martin's] deferred prosecution agreement." Stuart herself admitted she told counsel that "the pretrial diversion agreement would be revoked if [Martin] perjured himself." Stuart's own version of "the truth" should not predominate. The issue of truth *vel non* was for the jury, not for the prosecutrix. When questioned by the Court, the witness Martin admitted that, although no one from the United States Attorney's Office had ever threatened him directly, he did feel that there was a "good chance they probably would try to charge [him] with perjury and nullify [his] pretrial release" if he deviated from the truth (as perceived by Stuart).

To be sure, Martin did take the stand and testify in a fully exculpatory manner for

---

it must be done ... with the thorough understanding that you know the hazard you are taking." 409 U.S. at 95–96, 93 S.Ct. at 352. He also reminded the witness, who had a prior criminal record and was then serving a sentence, that he could be charged with perjury and could jeopardize his future parole opportunities if he were less than truthful on the stand.

**3.** While it is true that the original indictment against the witness had been dropped before the defendant's trial began, the witness testified at *voir dire* before the trial judge that "she was afraid that her indictment would not be dismissed." 682 F.2d at 476. Thus, her fear of prosecution remained an active one, regardless of any misunderstanding on her part of the procedural disposition of her case.

Teague, never pleading the fifth amendment. Nonetheless, although the transcript of his testimony reads in a seemingly forthright manner for one reviewing the printed text, the problem remains that an after-the-fact review by this Court cannot adequately discern the import of the critical nuances and subliminal effects of the way in which Martin delivered his testimony before the jury. Martin told the trial judge that he knew "the bind [he was] in testifying up here," and that he did not like "being up here;" at oral argument, Teague's counsel represented that Martin's delivery and demeanor were those of one who was "nervous and scared." Particularly since Stuart herself conducted the cross-examination, the pressure upon Martin could not dissipate, but rather was constantly before his eyes in the form of an ever-watchful, potentially menacing United States Attorney.

Given this factual scenario, it would be difficult for a reviewing court to determine whether Martin's testimony and the jury's reaction to it were actually affected by Stuart's actions: a search for indications of possible changes in his testimony would require a skill in divination that a court of review simply does not possess. As a general proposition, because any witness is subject to subtle motivations and instantaneous decision-making while on the stand (influencing every aspect of testimony from word choice, to tone and conviction of voice), a clear-cut determination of whether prosecutorial misconduct did or did not have a harmful effect on the testimony of a defense witness may often elude the Court. *Compare United States v. Morrison*, 535 F.2d 223, 228 (3rd Cir.1976) (Court acknowledges that "where the Government has prevented the defendant's witness from testifying freely before the jury, it cannot be held that the jury would not have believed the testimony or that the error is harmless").

In the instant case, it appears that we cannot say that "absent [Stuart's contacts it is] clear beyond a reasonable doubt that the jury would have returned a verdict of guilty." *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983). In *Hasting*, the Supreme Court did reverse the Court of Appeals' order for a new trial based on the improper closing argument of the prosecutor, since the error was determined to be harmless beyond a reasonable doubt. Finding that "a more compelling case of guilt is difficult to imagine" given the overwhelming weight of eyewitness testimony adduced against the defendants, the Court in *Hasting* reemphasized the teaching of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that "it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations...." — U.S. at —, 103 S.Ct. at 1980 (citations omitted).

Teague's situation may be readily distinguished from that of the defendants in *Hasting*, however. The evidence against Teague was not truly "compelling," and Martin's testimony was directed specifically to the issues of Phillips' purchase and continued possession of the gun, and to the fact that Martin never saw the gun in Teague's possession. The majority asserts that because Martin was not present on January 31, 1979 when Teague was arrested in his car with the gun, Martin "could give no helpful testimony about Teague's possession of the weapon" that day. However, Teague vigorously contested that he had any knowledge that the gun was in his car, and testified that Phillips had borrowed the car and left the gun under the front seat. Thus, Martin's testimony was critical on the issue of Teague's knowing possession of the gun on January 31, 1979.[4]

4. It is true that a violation of 18 U.S.C.App. § 1202 need not be predicated on specific intent. *See United States v. Harvill*, 501 F.2d 295 (9th Cir.1974) (defendant need not have acted knowingly, purposely intending to violate the law). Nevertheless, it is also clear that to support a conviction under the section, it must be shown that the defendant knew he was in possession of a firearm. *See United States v. Oliver*, 683 F.2d 224 (7th Cir.1982); *and United States v. Laymon*, 621 F.2d 1051 (10th Cir.1980).

It is possible that a single, factual mention of the consequences of perjury, perhaps in response to direct questioning by the witness, may not constitute misconduct or harmful error in some circumstances.[5] By contrast, an openly aggressive stance on the part of the prosecuting attorney would rise to the level of harmful error.[6] It seems clear that Stuart's behavior falls between these two points on the spectrum of prosecutorial misconduct; in my opinion, her actions do not fall within that band of error which is harmless beyond a reasonable doubt.

Of course, it is well to remember the observations of the Supreme Court in *Hasting* that "reversals of convictions under the court's supervisory power must be approached 'with some caution,'" 461 U.S. at ——, 103 S.Ct. at 1979 (citations omitted), but where the error is harmful (*i.e.*, when the conviction might not have been obtained absent the error), the potent relief afforded by the exercise of this Court's supervisory powers is wholly in order. I would thus emphasize the Court's duty "to implement a remedy for violation of recognized rights ...; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury ...; and finally, ... to deter illegal conduct." *United States v. Hasting*, 461 U.S. at ——, 103 S.Ct. at 1978–79.

The concerns articulated by the Court of Appeals for the Fifth Circuit in a similar case of prosecutorial misconduct are well taken and applicable to the case at bar. In *United States v. Hammond*, 598 F.2d 1008 (5th Cir.1979), an FBI agent's threats of "nothing but trouble" for two important defense witnesses caused those witnesses to refuse to testify. The trial judge read to the jury a stipulation as to what the witnesses would have said, and instructed the jury to give the stipulated testimony the same weight as it would have given live testimony. Relying in part on *Webb v. Texas, supra*, the Court of Appeals refused to permit the harmless error rule "to be a cover-up for every prosecutorial error," and held that such a due process violation was harmful *per se*. 598 F.2d at 1014. Like the defendant in *Hammond*, Teague presents a case in which witness credibility was directly at issue: Martin was a primary defense witness, his testimony bearing directly on Teague's alleged possession of the gun on the day of purchase and thereafter.

Moreover, as the Fifth Circuit observed in *Hammond*, it is difficult to imagine "that such a violation of due process would result from anything but intentional conduct on the part of the government ...." *Id.* at 1013. If any warning regarding the consequences of perjury appears necessary, that warning should come from the trial judge himself, not from an overly zealous prosecuting attorney eager to assume responsibility for assuring an attitude she regards as proper on the part of testifying witnesses. Already standing as potent symbols of the Government's power in a criminal proceeding, prosecuting attorneys should not be permitted to capitalize upon that power to gain increased influence by subtle, or not so subtle, psychological manipulation of witnesses.[7]

---

5. *See United States v. Valdes*, 545 F.2d 957, 960 (5th Cir.1977) (defendant fails to establish governmental impropriety when District Attorney spoke to defense witness "only once" during a lengthy pretrial interview to inform him of possible consequences of perjury, and witness' "own counsel was present throughout those proceedings").

6. *See Morrison*, 535 F.2d at 227 (applying error *per se* rule in a clear case of prosecutorial misconduct when the United States Attorney contacted the defense witness on at least three occasions regarding possible prosecution, subpoenaed the witness to compel a "highly intimidat-

ing personal interview at the prosecutor's office" immediately before she was called to the stand, and threatened both perjury charges and prosecution as a juvenile if the witness incriminated herself on the stand).

7. *See also United States v. Thomas*, 488 F.2d 334 (6th Cir.1973) (per curiam) (adopting a rule of error *per se*, Court refused to consider balancing the apparently overwhelming evidence of guilt against the allegedly insufficient prejudice to defendant to find harmless error; *Washington v. Texas* clearly established the fundamentality of a defendant's right to produce witnesses on his behalf, regardless of the weight of the evi-

dence against him). *But see United States v. Simmons,* 670 F.2d 365, 372 n. 4, 78 L.Ed.2d 119 (D.C.Cir.1982) (per curiam), *cert. denied,* —— U.S. ——, 104 S.Ct. 121 (1983) (defendant must prove "substantial prejudice" to obtain reversal of conviction on grounds that prosecutor deprived him of defense testimony by threatening a witness).