STATE OF MINNESOTA

IN SUPREME COURT

A14-2165

Hennepin County                                                Dietzen, J.


Darryl Colbert, petitioner,

             Appellant,

vs.                                          Filed:  October 21, 2015
                                             Office of Appellate Courts
State of Minnesota,

             Respondent.
                    _____

Zachary A. Longsdorf, Inver Grove Heights, Minnesota, for appellant.

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Lee W. Barry, Assistant Hennepin County Attorney, Minneapolis, Minnesota, for respondent.
                    _____

S Y L L A B U S

1.     Harmless error analysis applies to a claim that a government actor interfered with a defense witness's decision to testify.

2.     The postconviction court did not abuse its discretion by summarily denying appellant's witness intimidation claim because the alleged conduct was harmless beyond a reasonable doubt.

1

3. The postconviction court did not abuse its discretion by concluding that appellant's juror-misconduct claim is procedurally barred under *State v. Knaffla*, 309 Minn. 246, 243 N.W.2d 737 (1976).

4. The postconviction court did not abuse its discretion by summarily denying appellant's altered-exhibit claim because it lacks merit on its face.

Affirmed.

Considered and decided by the court without oral argument.

O P I N I O N

DIETZEN, Justice.

Appellant Darryl Colbert was found guilty by a Hennepin County jury of the first-degree murder of Robert Mitchell in December 2003, and was sentenced to life imprisonment without the possibility of release. We affirmed Colbert's conviction on direct appeal. *State v. Colbert* (*Colbert I*), 716 N.W.2d 647, 649 (Minn. 2006). In July 2014, Colbert filed his sixth postconviction petition under Minn. Stat. § 590.01 (2014). The postconviction court summarily denied the petition without an evidentiary hearing. Because the record conclusively shows that Colbert's claims are harmless beyond a reasonable doubt, procedurally barred, or meritless, we affirm.

On December 26, 2003, Robert Mitchell was shot and killed on the 2800 block of Columbus Avenue in Minneapolis. Colbert was arrested and indicted for first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2014), and second-degree intentional murder, Minn. Stat. § 609.19, subd. 1(1) (2014), for Mitchell's death. Following a trial, the jury found Colbert guilty of first-degree murder.

The State introduced testimony of the events leading up to the shooting death of Mitchell on the evening of December 26, 2003, and a related shooting involving Colbert and Troy Parker, which occurred on the evening of December 27, 2003.[1]  Surveillance video footage established that Colbert arrived at Sunny's, a bar and restaurant on Lake Street and Chicago Avenue in Minneapolis, around 5:33 p.m. on December 26 wearing a brimmed, fedora-style hat and long topcoat.  At the time, Mitchell, his fiancée, Gladys Rogers, and several friends including Kathleen Washington and Clarence Ealey were also at Sunny's to celebrate the engagement of Mitchell and Rogers.  Washington testified that she saw Colbert talking to Mitchell, and overheard part of the conversation in which $50 was mentioned.  Washington then saw Colbert leave Sunny's with Mitchell.  The surveillance tape from Sunny's showed Colbert talking to Mitchell at 5:50 p.m., and the two of them leaving together at 6:13 p.m.  Rogers testified that Mitchell told her he was going to buy a television for $50 and was leaving with someone named "Darryl."

Shortly after Colbert and Mitchell left Sunny's, three individuals separately witnessed two cars parked trunk-to-trunk approximately one and one-half blocks north of Sunny's on the 2800 block of Columbus Avenue.  One of the cars was described as an older model white car with a "boxed-shaped" or "squared-off" back end.  Two men were seen standing near the cars.  The witnesses saw one of the men, who was wearing a dark, brimmed hat and a long, dark topcoat, shoot the other man.  The shooter drove away in the older model white car.  Colbert drove a white, 1988 Chrysler New Yorker, which

---

[1]    The underlying facts are set forth in detail in *Colbert I*, 716 N.W.2d at 649–53. We limit our discussion to the facts directly relevant to this appeal.

witnesses testified was similar to the shooter's car. Two of the witnesses called 911 immediately after the shooting. The first call was logged at 6:17 p.m.

At 6:21 p.m., surveillance video from Sunny's showed a white Chrysler New Yorker driving past Sunny's on Chicago Avenue. Colbert admitted that the white Chrysler New Yorker seen driving past Sunny's belonged to him and that he was driving it. Police officers testified that it would take 50–53 seconds to drive from Sunny's to the murder scene.

The next day, Colbert was involved in a separate incident involving the gun used in Mitchell's murder. Troy Parker testified that Colbert brought the gun to the apartment of Colbert's nephew, M.C., that a fight between Colbert and Parker occurred in the apartment, and that Colbert shot Parker and then accidentally shot himself. Guy Richardson, who was M.C.'s neighbor in the apartment building at the time, testified that Colbert came to Richardson's apartment and asked if he had seen Parker, and that Colbert used Richardson's phone to call Parker. When Colbert left the apartment he put his hands behind his back, Richardson heard a sound like a gun cocking, and Colbert said, "mind your business about what you hear over here or I'm going to come back." A few minutes later, Richardson heard Parker's voice and then three gun shots.

Colbert denied that he was involved in the shooting of Mitchell. He testified that he arrived at Sunny's at 5:33 p.m. on December 26 wearing a long coat and brimmed hat, and that he briefly spoke to Mitchell. According to Colbert, he left Sunny's alone, Mitchell left behind him, and they went their separate ways. After Colbert left Sunny's he walked to his car, which was parked in the KFC parking lot approximately one-half

4

block north of Sunny's, drove out of the KFC parking lot, and then headed south on Chicago Avenue. Colbert relied on an aerial photograph of the neighborhood where the murder occurred (Exhibit 4) to testify that it would have been impossible for him to leave Sunny's, drive to the crime scene, commit the crime, and then drive back past Sunny's during the eight-minute time period between 6:13 p.m. and 6:21 p.m.

Additionally, Colbert disputed his role in the December 27 incident. Colbert stated that Parker asked him to come over to M.C.'s apartment and "cook up some crack for him." At the apartment, Parker accused Colbert of stealing his drugs and pointed a gun at Colbert. During an ensuing struggle Parker shot both of Colbert's legs, and when Colbert grabbed for the gun, Parker was shot. Colbert admitted that an earlier version of the incident he told police was a lie.

Howard Wilder testified that he and Colbert drove to M.C.'s apartment building in Colbert's car and that Colbert left the car saying he would be back shortly. According to Wilder, Colbert did not appear to be carrying a gun when he left the car. Wilder testified further that Colbert stumbled out of the apartment building about twenty minutes later saying "he shot me." As Colbert entered the car, Wilder saw a man holding a gun emerge from M.C.'s apartment building. On cross-examination, Wilder admitted there were several inconsistencies between his testimony and a prior statement he had given to the police.

On direct appeal, Colbert challenged his conviction based on: (1) the sufficiency of the evidence; (2) an alleged discovery violation by the State; and (3) prosecutorial misconduct. *Colbert I*, 716 N.W.2d at 649. To support his sufficiency of the evidence

5

claim, Colbert cited the inconsistent witness descriptions of the shooter, the implausibility of Parker's version of the December 27 incident, and the narrow time-frame between the time Colbert left Sunny's and the time he was observed driving past Sunny's at 6:21 p.m., shortly after the murder occurred. *Id.* at 653. We affirmed Colbert's conviction, concluding that the evidence was sufficient to support Colbert's conviction and that Colbert's other claims were meritless. *Id.* at 653–57.

Colbert subsequently petitioned for a writ of habeas corpus in federal district court asserting the same three grounds for relief he had raised in his direct appeal. *See Colbert v. Minnesota*, No. 06-4407, 2007 WL 4224214 (D. Minn. Nov. 28, 2007). The court denied the writ. *Id.* at \*5.

In March 2008 Colbert filed his first petition for postconviction relief.[2] The postconviction court denied Colbert's petition without a hearing. Colbert filed his second petition for postconviction relief in July 2008.[3] The postconviction court again denied Colbert's petition without a hearing. Colbert attempted to appeal the denial, but we dismissed the appeal because he failed to timely file a notice of appeal. *See Colbert v. State*, A09-858, Order at 2 (Minn. filed May 27, 2009). In December 2009, Colbert filed

---

[2] In his first petition, Colbert alleged that (1) the evidence was insufficient to convict him; (2) the State committed a discovery violation; and (3) additional forensic testing would prove his innocence.

[3] In his second petition, Colbert argued (1) that he received ineffective assistance of counsel and (2) that the State used illegally seized evidence against him at trial.

6

his third petition for postconviction relief.[4]  Colbert amended this petition with additional claims in February 2010 (Colbert's fourth request for postconviction relief).[5]  The postconviction court summarily denied these petitions.  In January 2011, Colbert filed his fifth petition for postconviction relief.[6]  The postconviction court summarily denied the petition and Colbert appealed.  We affirmed the postconviction court's denial of Colbert's fifth petition, concluding that the petition was untimely under Minn. Stat. § 590.01, subd. 4(a).  *Colbert v. State* (*Colbert II*), 811 N.W.2d 103, 105 (Minn. 2012).

Colbert filed his sixth petition for postconviction relief on July 29, 2014, alleging (1) newly discovered evidence that a defense witness was threatened by a state actor prior to testifying at trial; (2) newly discovered evidence that the State altered Exhibit 4 and used the altered exhibit to make improper arguments at trial; (3) juror misconduct; and (4) that the cumulative errors require a new trial in the interests of justice.  The postconviction court denied Colbert's petition without an evidentiary hearing.

---

[4]  In Colbert's third petition he asserted multiple deficiencies by his trial counsel amounting to ineffective assistance of counsel.

[5]  In his fourth petition, Colbert argued that his state and federal constitutional rights were violated at trial because (1) he was innocent; (2) the prosecutor had committed misconduct by using false evidence and manipulating the testimony; and (3) the State's forensic video analyst did not qualify as an expert witness.

[6]  In his fifth petition, Colbert alleged:  (1) the police used unnecessarily suggestive identification techniques to coerce witnesses into positively identifying his car as the one at the crime scene; (2) an expert witness for the State impermissibly based his testimony on illegally seized evidence; and (3) the prosecutor committed misconduct by, among other things, introducing an altered aerial photograph of the neighborhood where the murder occurred.

7

## I.

On appeal, Colbert argues the postconviction court abused its discretion in denying his petition by concluding: (1) the witness intimidation claim lacks merit; (2) the claim based on Exhibit 4 is time-barred under Minn. Stat. § 590.01, subd. 4(a); and (3) the juror misconduct and the cumulative error claims are procedurally barred under *State v. Knaffla*, 309 Minn. 246, 243 N.W.2d 737 (1976).

We review the denial of a petition for postconviction relief, as well as a request for an evidentiary hearing, for an abuse of discretion. *Riley v. State*, 819 N.W.2d 162, 167 (Minn. 2012). We review legal issues de novo, but we review factual matters under the clearly erroneous standard. *Brown v. State*, 863 N.W.2d 781, 786 (Minn. 2015); *Riley*, 819 N.W.2d at 167. A postconviction court need not grant a hearing on a claim if the files and records of the proceeding conclusively establish that the petitioner is not entitled to relief. Minn. Stat. § 590.04, subd. 1 (2014). Accordingly, a postconviction court may summarily deny a claim that is untimely under the postconviction statute of limitations, Minn. Stat. § 590.01, subd. 4(a), or procedurally barred under *Knaffla*. *See, e.g.*, *Lussier v. State*, 853 N.W.2d 149, 153 (Minn. 2014); *Riley,* 819 N.W.2d at 170–71.

## II.

Colbert first argues he was deprived of a fair trial due to the State's intimidation of a trial witness. Colbert relies on the affidavit of Howard Wilder, which states that he was interviewed by a man and a woman "from the district attorney's office" before trial and that later, at trial, the man told Wilder that if he said anything to help Colbert the prosecutor would make his life "a living hell." Because Wilder believed the man was a

prosecutor and that he "would follow up on his threats," Wilder did not report the conversation. The State argues that Colbert's witness-intimidation claim is time-barred under Minn. Stat. § 590.01, procedurally barred under *Knaffla*, and lacks substantive merit.

Assuming without deciding that Colbert's witness-intimidation claim is not time-barred under Minn. Stat. § 590.01 or procedurally barred under *Knaffla*, we turn to the merits of that claim. The parties do not agree on the standard we should apply in assessing the witness intimidation claim. Colbert argues that the government actor's interference with Wilder's decision to testify violated his due process rights and is harmful *per se*. *See, e.g.*, *United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973). The State argues that Colbert must show prejudice to be entitled to a new trial. *State v. Graham*, 764 N.W.2d 340, 349 (Minn. 2009).

The U.S. Supreme Court has recognized that a defendant's right to present his own witnesses in order to establish a defense is a fundamental element of due process. *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Taylor v. Illinois*, 484 U.S. 400, 408 (1988) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense. Indeed, this right is an essential attribute of the adversary system itself." (internal citation omitted)). A defendant's right to present a complete defense includes the right to compel the attendance, and present the testimony, of his own witnesses. *Washington*, 388 U.S. at 18–19. The same rights are protected under the Minnesota Constitution. Minn. Const. art. I, § 7 ("No person shall be held to answer for a criminal offense without due process of law."). Indeed, the right to present a complete

9

defense specifically encompasses "the right to call witnesses." *State v. LeDoux*, 770 N.W.2d 504, 513 (Minn. 2009) (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

In *Webb v. Texas*, the Supreme Court concluded that a defendant's due process rights had been violated when the trial judge gratuitously and severely admonished the sole witness proffered by the defense, who had a criminal record and was then serving a prison sentence, on the dangers of perjury, and the witness subsequently refused to testify. 409 U.S. 95, 97–98 (1972). In reversing the conviction, the Court stated that "the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." *Id.* at 98.

In *United States v. Thomas*, the Sixth Circuit addressed whether the due process rights of three defendants had been violated when a secret service agent involved in the case told a prospective witness he would be prosecuted if he testified in the case, and the witness subsequently refused to testify. 488 F.2d 334 (6th Cir. 1973). The *Thomas* court relied on *Webb* to reverse the co-defendants' convictions and order a new trial. *Id*. at 336. The *Thomas* court rejected the government's argument that *Webb* required a finding of prejudice. *Id.* The court concluded that the government's actions "substantially interfered with any free and unhampered determination the witness might have made as to whether to testify and if so as to the content of such testimony," and even if a showing of prejudice were required, nothing short of offering the witness complete immunity could have "restored his free and voluntary choice, eliminating the prejudice." *Id.*

10

Subsequent federal cases have used the "substantially interfered" language in *Thomas* as the test for determining when a government actor's conduct violates a defendant's right to present a complete defense. *See, e.g.*, *United States v. Serrano*, 406 F.3d 1208, 1216 (10th Cir. 2005); *United States v. Jackson*, 935 F.2d 832, 846 (7th Cir. 1991); *Demps v. Wainwright*, 805 F.2d 1426, 1433 (11th Cir. 1986); *Peeler v. Wyrick*, 734 F.2d 378, 381 (8th Cir. 1984); *United States v. Teague*, 737 F.2d 378, 383 (4th Cir. 1984); *United States v. Little*, 753 F.2d 1420, 1439 (9th Cir. 1984); *United States v. Crawford*, 707 F.2d 447, 449 (10th Cir. 1983); *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir. 1980); *United States v. Henricksen*, 564 F.2d 197, 198 (5th Cir. 1977). Similarly, we have stated that to determine "whether the State has infringed on a defendant's constitutional right to present a defense . . . 'the dispositive question in each case is whether the government actor's interference with a witness's decision to testify was 'substantial.' " *State v. Graham*, 764 N.W.2d 340, 349 (Minn. 2009) (quoting *Serrano*, 406 F.3d at 1216).[7] We therefore use the phrase "substantial interference test" when referring to this test.

---

[7] The inquiry into whether the governmental interference is substantial is "extremely fact specific." *United States v. True*, 179 F.3d 1087, 1090 (8th Cir. 1999). Interference may involve threats of prosecution, *e.g., United States v. Smith*, 478 F.2d 976, 979 (D.C. Cir. 1973), or other intimidating conduct, *see, e.g., United States v. MacCloskey*, 682 F.2d 468, 479 (4th Cir. 1982) (prosecutor's "eleventh hour" telephone call to witness's attorney reminding him of potential fifth amendment problem if witness took stand), that were *designed* to intimidate, *see, e.g., United States v. Whittington*, 783 F.2d 1210, 1219 (5th Cir. 1986); *United States v. Little*, 753 F.2d 1420, 1440 (9th Cir. 1984). When, under the totality of the circumstances, the substance of what the state actor communicates to the witness "is a threat over and above what the record indicates is necessary, and appropriate, the inference that the prosecutor sought to coerce a witness

(Footnote continued on next page.)

11

In *State v. Beecroft*, a plurality opinion, the substantial interference test was applied to assess whether the prosecutor and the medical examiner had violated the defendant's due process rights by interfering with defense witnesses' decisions to testify. 813 N.W.2d 814, 839 (Minn. 2012). The witness interference in *Beecroft* was discovered during the trial. *Id.* at 828-30. Although the defendant in *Beecroft* made a number of requests for relief, she did not assert a due process claim. *Id.* Due to her failure to specifically object on due process grounds at trial, three members of the court would have applied plain-error analysis to the witness-interference claim. *Id.* at 836 (citing *State v. Jenkins*, 782 N.W.2d 211, 229-30 (Minn. 2010)). Unlike the defendant in *Beecroft*, Colbert did not discover the witness-interference claim until after trial. Because Colbert could not make a timely objection at trial to the witness interference, his case does not implicate the principle underlying the forfeiture doctrine: "encourage[ing] defendants to object while in the district court so that errors can be corrected before their full impact is realized." *State v. Pearson*, 775 N.W.2d 155, 161 (Minn. 2009). Consequently, the present case provides us with the opportunity to decide whether harmless-error analysis or a harmful *per se* rule should apply to a claim that a government actor interfered with a defense witness's decision to testify.

Generally, there are two types of error: structural error and trial error. *State v. Kuhlmann*, 806 N.W.2d 844, 851 (Minn. 2011). On the one hand, "[s]tructural errors are

(Footnote continued from previous page.)
into silence is strong." *United States v. Jackson*, 935 F.2d 832, 847 (7th Cir. 1991) (internal quotation omitted).

12

'defects in the constitution of the trial mechanism.' " *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)).  Such errors affect the entire trial from beginning to end and undermine the structural integrity of the criminal tribunal itself.  *Id.*  On the other hand, a trial error is an error that "may [] be quantitatively assessed in the context of the other evidence presented in order to determine whether [it was] harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 307–08.

The United States Supreme Court has observed that most constitutional errors are trial errors, which are reviewed under a "prejudicial-impact" or harmless-error analysis to determine whether they require reversal and a new trial.  *Neder v. United States*, 527 U.S. 1, 8 (1999); *see, e.g.*, *Carella v. California*, 491 U.S. 263, 266 (1989) (per curiam) (jury instruction containing erroneous conclusive presumption); *Crane v. Kentucky*, 476 U.S. 683, 691 (1986) (exclusion of the defendant's testimony regarding the circumstances of his confession); *see also State v. Finnegan*, 784 N.W.2d 243, 251 n.6 (Minn. 2010) (continuing the trial in the defendant's absence).  Structural errors resulting in automatic reversal occur only in a "very limited class of cases." *Neder*, 527 U.S. at 8; *see, e.g.*, *Sullivan v. Louisiana*, 508 U.S. 275, 281–82 (1993) (constitutionally deficient reasonable-doubt jury instruction); *Waller v. Georgia*, 467 U.S. 39, 49–50 (1984) (denial of the right to a public trial); *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984) (denial of the right to self-representation at trial); *Gideon v. Wainwright*, 372 U.S. 335, 345 (1963) (total deprivation of the right to counsel at trial); *Tumey v. Ohio*, 273 U.S. 510, 531–32 (1927) (deprivation of the right to an impartial judge); *State v. Logan*, 535 N.W.2d 320, 324 (Minn. 1995) (failure to dismiss a biased juror for cause).  In *United*

*States v. Hasting*, the Court acknowledged that certain errors may involve "rights so basic to a fair trial that their infraction can never be treated as harmless error," but the Court concluded that "it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." 461 U.S. 499, 508-09 & n.6 (1983).

We conclude that harmless-error analysis applies to a claim that a government actor interfered with a defense witness's decision to testify. The majority of federal circuits that have considered the issue have applied harmless-error analysis.[8] In favoring harmless error over a *per se* test, these circuits have acknowledged the Supreme Court's preference towards treating most errors as trial errors rather than structural errors. Thus, to obtain a new trial under the substantial interference test a defendant must prove (1) a government actor interfered with a defense witness's decision to testify; (2) the interference was substantial; and (3) the defendant was prejudiced by the conduct.

---

[8] *See, e.g.*, *United States v. Combs*, 555 F.3d 60, 64 (1st Cir. 2009); *United States v. Dogskin,* 265 F.3d 682, 686 (8th Cir. 2001); *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997); *United States v. Saunders*, 943 F.2d 388, 392–93 (4th Cir. 1991); *United States v. Pinto*, 850 F.2d 927, 933 (2d Cir. 1988); *United States v. Simmons*, 670 F.2d 365, 371 n.4 (D.C. Cir. 1982). In fact, even the Sixth Circuit has moved away from the harmful *per se* analysis adopted in *Thomas*. *See, e.g.*, *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997) (applying harmless-error test). Moreover, the authority for applying a harmful *per se* rule to instances of substantial governmental interference with a defense witness's decision to testify, all predate the Supreme Court's decision in *Hasting*. *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir. 1980); *United States v. Morrison*, 535 F.2d 223, 228 (3d Cir. 1976). Later opinions have acknowledged that a *per se* analysis is no longer viable in the wake of *Hasting*. *See, e.g., Combs*, 555 F.3d at 64.

Colbert has failed to satisfy the third requirement of the substantial interference test. Wilder testified as expected and corroborated Colbert's version of the events. A review of his testimony reveals that Wilder had no reluctance to tell his story, and even embellished the details he provided to the prosecutor in an earlier taped statement in a way that was favorable to Colbert. Moreover, Wilder's testimony did not foreclose the possibility that Colbert possessed the gun used in the December 27 shooting. Both Parker and Richardson testified that Colbert had a gun at M.C.'s apartment on December 27. Consequently, even assuming the allegations in Wilder's affidavit are true, and assuming that this conduct constitutes a "substantial interference" with Wilder's decision to testify, Colbert has failed to prove he was prejudiced in any way by the conduct. Therefore, the postconviction court did not abuse its discretion by summarily denying Colbert's witness intimidation claim because the alleged conduct is harmless beyond a reasonable doubt.

III.

Second, Colbert challenges the postconviction court's summary denial of his claim that he is entitled to a new trial due to juror misconduct. Colbert relies on the affidavit of a co-worker of one of the jurors at his trial, which states that the juror was emotional and felt she had been pressured into voting guilty, despite her better judgment. The postconviction court concluded this claim was procedurally barred under *Knaffla* because it was known but not raised at the time of Colbert's direct appeal and previous postconviction petitions. Specifically, the court determined that Colbert's counsel received the co-worker's affidavit on February 23, 2005, and submitted a request for a

15

*Schwartz* hearing, which was denied by the district court on July 11, 2005. Because Colbert knew of the facts underlying his juror-misconduct claim at the time of his direct appeal and previous postconviction petitions but failed to raise it until nearly nine years later, the court concluded that this claim is procedurally barred under *Knaffla*. Nonetheless, Colbert argues that the claim should be reviewed under the interests-of-justice exception to the *Knaffla* rule.

The *Knaffla* rule originally provided that "where direct appeal has once been taken, all matters raised therein, and all claims known but not raised, will not be considered upon a subsequent petition for postconviction relief." *Knaffla*, 309 Minn. at 252, 243 N.W.2d at 741. In *Black v. State*, 560 N.W.2d 83, 85 (Minn. 1997), we reformulated the *Knaffla* rule as follows: once a direct appeal has been taken, all claims raised in the direct appeal and all claims that were known *or should have been known* but were not raised in the direct appeal are procedurally barred. *See also Andersen v. State*, 830 N.W.2d 1, 8 (Minn. 2013); *Boitnott v. State*, 640 N.W.2d 626, 630 (Minn. 2002). Additionally, the *Knaffla* rule bars consideration of claims that were raised, or could have been raised, in a previous postconviction petition. *Hooper v. State*, 838 N.W.2d 775, 787 (Minn. 2013). Under the interests-of-justice exception to the *Knaffla* rule, the court may review a claim as fairness requires when the claim has substantive merit and the

16

petitioner did not deliberately and inexcusably fail to raise the issue in the direct appeal or a previous postconviction petition.[9] *Evans v. State*, 788 N.W.2d 38, 44 (Minn. 2010).

We have consistently followed the rule that a jury's deliberations must remain inviolate and its verdict may not be reviewed or set aside on the basis of affidavits or testimony concerning that which transpired in the course of those deliberations. *See, e.g.*, *State v. Pederson*, 614 N.W.2d 724, 730–31 (Minn. 2000); *State v. Hoskins*, 292 Minn. 111, 125–26, 193 N.W.2d 802, 812 (1972). The usefulness of a juror's statement regarding a verdict is limited by Minn. R. Evid. 606(b), which provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention, or whether any outside influence was improperly brought to bear upon any juror, or as to any threats of violence or violent acts brought to bear on jurors, from whatever source, to reach a verdict. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

---

[9] In 2005 the Legislature amended Minn. Stat. § 590.01, subd. 1 by adding a sentence providing that "[a] petition for postconviction relief after a direct appeal has been completed may not be based on grounds that could have been raised on direct appeal of the conviction or sentence." Act of June 2, 2005, ch. 136, art. 14, § 12, 2005 Minn. Laws 901, 1097. Based upon the 2005 amendments to the postconviction statute, it is unclear whether the *Knaffla* exceptions remain applicable to petitions for postconviction relief. Because that issue has not been raised by the State, we decline to reach it in this case.

17

*See also Mattox v. United States*, 146 U.S. 140, 148–49 (1892); *Hoskins*, 292 Minn. at 125, 193 N.W.2d at 812 ("[J]urors are not competent to disclose any matters which inhere in the verdict, such as their mental processes in connection with it or any other matter resting alone in their minds or consciences").

Colbert offers no explanation for his failure to raise the juror-misconduct claim in his direct appeal or in any of his several prior postconviction petitions. Moreover, Colbert's juror-misconduct claim lacks merit because the affidavit Colbert relies upon contains information about the juror's thought processes, which is not admissible to show misconduct under Minn. R. Evid. 606(b). Accordingly, the postconviction court did not abuse its discretion by concluding that Colbert's juror-misconduct claim is procedurally barred under *Knaffla*, because Colbert failed to establish that his claim should be reviewed under the interests-of-justice exception.

IV.

Colbert next argues that the State altered Exhibit 4 prior to trial and used the altered exhibit to make improper arguments at trial. Colbert relies on the affidavit of private investigator, William Ojile, which states that there has never been a direct route from the KFC parking lot north through the alleyway to Columbus Avenue, without going to Lake Street. Based on this evidence, Colbert argues that the State altered Exhibit 4 to make it appear as though there was a direct route from the KFC parking lot north through the alleyway to Columbus Avenue and used the altered exhibit to make improper arguments at trial.

18

Colbert's claim lacks merit. Specifically, the evidence he presents is not *new* evidence. Exhibit 4 clearly shows that any possible direct route through an alley from the KFC parking lot to the crime scene on Columbus Avenue is blocked by a fence or some other impediment. Thus, the nonexistence of a direct route from the KFC parking lot north through the alleyway to Columbus Avenue is not new information and could have been discovered by examining the exhibit at the time of Colbert's trial. Further, Colbert has failed to establish that Exhibit 4 was altered or used improperly by the prosecutor. The prosecutor argued that Colbert "drove out the back of the KFC lot, over to Columbus Avenue, drove his car up, parked in the position where it was seen" by witnesses. The prosecutor's argument is consistent with Exhibit 4, which indicates that the only possible route from the back of the KFC lot to Columbus Avenue is to take a left out of the KFC lot, drive south through the alley, make a right turn on Lake Street, and another right turn to head north on Columbus Avenue to the crime scene.

In sum, because Colbert presents no new evidence and his claim is meritless, the postconviction court did not abuse its discretion when it denied his altered exhibit claim.[10]

---

[10]    Colbert contends he should be granted a new trial due to the combined effect of the claimed witness tampering, juror misconduct, and alteration of evidence, as well as inconsistencies in the evidence presented. "Cumulative error exists when the 'cumulative effect of the * * * errors and indiscretions, none of which alone might have been enough to tip the scales, operate to the defendant's prejudice by producing a biased jury.' " *State v. Johnson*, 441 N.W.2d 460, 466 (Minn. 1989) (alteration in original) (citing *United States v. Samango*, 607 F.2d 877, 884 (9th Cir. 1979)). To the extent that errors occurred in this case, our careful review of the record convinces us that Colbert was not deprived of a fair trial.

V.

For the foregoing reasons, we affirm the postconviction court's denial of Colbert's sixth petition for postconviction relief.

Affirmed.