# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A14-1778

State of Minnesota,
Respondent,

vs.

Quintin Deshun Dye,
Appellant.

**Filed November 30, 2015**
**Affirmed in part, reversed in part, and remanded**
**Kirk, Judge**

Hennepin County District Court
File No. 27-CR-13-40543

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Kelly O'Neill Moller, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Leslie J. Rosenberg, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Kirk, Presiding Judge; Johnson, Judge; and Bjorkman, Judge.

## S Y L L A B U S

Whether an intrusive gunshot wound creates "a high probability of death" under Minnesota Statutes section 609.02, subdivision 8 (2012), is determined at the time it is known what path the bullet took and what parts of the body were hit.

# OPINION

**KIRK**, Judge

Appellant Quintin Deshun Dye challenges his convictions of first-degree assault, second-degree assault, and unlawful possession of a firearm, arguing (1) the evidence was insufficient to support his conviction of first-degree assault because the victim did not suffer great bodily harm; (2) appellant's rights under the Confrontation Clause were violated when the district court allowed the jury to hear the victim's statements to the 911 dispatcher and to police officers at the scene; (3) the district court erred in admitting certain statements of the victim as prior consistent statements because they were inconsistent with trial testimony; and (4) the prosecutor committed prejudicial misconduct during his closing argument by vouching for the victim's credibility, improperly inflaming the jury's passions, and suggesting that appellant was to blame for the victim's absence at trial. We affirm in part, reverse in part, and remand.

## FACTS

On December 9, 2013, at 2:36 a.m., E.G. called 911 stating that appellant had just shot her in the lower back. She told the dispatcher that she was at home with her children. Minneapolis police responded to the call. When the officers arrived, E.G. was still on the phone with the dispatcher. Before hanging up, E.G. stated to the officers, "He [left in a] black car [with] his sister's kids."

At trial, Officer Samantha Belcourt testified that, when the officers arrived, E.G. was hunched over, wincing and appeared to be in a lot of pain. She was also crying, "very panicky," and scared. E.G. was trying to position herself to breathe comfortably

2

and was having trouble communicating and speaking. Officer Belcourt observed what she believed to be a gunshot wound to E.G.'s lower back. Although the wound was bleeding, it did not require compression or bandages.

Officer Belcourt testified that E.G. told her that appellant, her ex-boyfriend, shot her after a verbal argument between the two occurred outside her house. E.G. indicated that, before she was shot, she was walking away from appellant toward her house and appellant was standing outside of his vehicle. E.G. told Officer Belcourt what appellant was wearing and that he left in a black SUV with a black male. E.G. also told Officer Belcourt that she thought appellant was going to his "baby mama's" house.

The paramedics arrived a few minutes after police. Officer Belcourt testified that at this time, E.G. was still "panicky" and was "extremely concerned about her children." One of the paramedics testified that E.G. was able to walk, talk, and breathe, and there was not excessive external bleeding.

Assisted by the officers and paramedics, E.G. walked down the stairs of her house to the ambulance. However, paramedics had difficulty persuading E.G. to enter the ambulance. The paramedic testified that E.G. seemed distraught, upset, and repeated several times "my kids, my kids." The paramedic also testified that E.G. was in shock and fearful. E.G. told the paramedic that she feared that the shooter was going to return and hurt her children.

Once inside the ambulance, paramedics confirmed that E.G. had been shot. The paramedic testified that, based on the location of the bullet's entry, she treated E.G.'s injury as life-threatening. E.G. was transported to the hospital.

The emergency-room physician testified that upon E.G.'s arrival at the hospital, they treated her injuries as life-threatening and ordered a CT scan of her torso to determine the bullet's path. The scan revealed that the bullet had traveled in a straight line through eight inches of tissue in E.G.'s abdomen. Physicians made a small incision to remove the bullet from the left side of her lower back. The doctor testified that, if the bullet had traveled the same distance in other directions, it could have hit critical body parts, such as her kidneys, aorta, spinal cord, or heart, and would have been life-threatening.

E.G. was discharged from the hospital the following day. The doctor was unaware whether E.G. received any follow-up treatment. The doctor testified that this type of injury could result in a permanent lump due to scar tissue. He also testified that lying on her back or side, or sitting against anything that applied pressure to the injured area, would probably be painful for an extended period of time.

Officer Belcourt conducted an interview of E.G. while she was being transported to the hospital and upon their arrival. During this interview, E.G. told Officer Belcourt that appellant shot her. Sergeant Brian Menne conducted a recorded interview of E.G. at the hospital the following day. During this interview, E.G. told Sergeant Menne that she was "almost positive" the male that was with appellant, "Mess," shot her. Sergeant Menne testified that E.G. gave him additional information during the interview that she did not want recorded. He testified that she appeared fearful that if she gave him too much information she would be in trouble with appellant. Sergeant Menne also testified that E.G. appeared to be "very scared" and trying to protect appellant.

4

At the conclusion of the trial, the district court instructed the jury on the charged offenses, first-degree assault, second-degree assault, and unlawful possession of a firearm. The jury found appellant guilty on all three counts. This appeal follows.

**ISSUES**

1. Was the evidence sufficient to support a conviction of first-degree assault?

2. Did the admission of E.G.'s 911 call statements and initial statements to officers violate appellant's confrontation rights?

3. Did the district court plainly err in admitting certain statements E.G. made to officers at the hospital as prior consistent statements?

4. Did the prosecutor commit prejudicial misconduct in his closing argument?

**ANALYSIS**

**I.     The evidence in the record does not support appellant's conviction of first-degree assault.**

Appellant challenges the sufficiency of the evidence to support his conviction of first-degree assault. Specifically, he claims that the state failed to prove beyond a reasonable doubt that E.G. suffered great bodily harm.

When presented with a claim of insufficient evidence, this court's review is limited to a careful analysis of the record to determine whether the evidence, viewed in a light most favorable to the conviction, was sufficient to allow the jury to reach the verdict that it did. *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012). "[W]e will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the [appellant] was guilty of the charged offense." *Id*.

The jury found appellant guilty of first-degree assault under Minnesota Statutes section 609.221, subdivision 1 (2012). Under this statute, first-degree assault occurs when a person "assaults another and inflicts great bodily harm." *Id.* "Great bodily harm" is defined as

> bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm.

Minn. Stat. § 609.02, subd. 8.

Appellant contends that there was insufficient evidence to support the jury's conclusion that E.G.'s injuries constituted great bodily harm because her injuries were not life-threatening. The state maintains that when appellant fired a bullet into E.G.'s torso, he inflicted bodily injury that created "a high-probability of death." *Id.* The state emphasizes that a bullet that enters the torso where it did on E.G. can hit critical body parts, such as the lungs, heart, kidneys, aorta, or spine, and that other patients have died from gunshot wounds in the same area as E.G.'s.

The state's argument fails in light of our holding in *State v. Gerald*, 486 N.W.2d 799, 802 (Minn. App. 1992) (holding that fact that cut was located close to major vein or artery and could have been more serious not sufficient to satisfy statutory requirement of "high probability of death"). In *Gerald*, we explained that, "[u]nder the plain language of the statute, the injury itself must be life-threatening." *Id.* "The fact that a lesser injury is located near a major organ or vessel and therefore could have been more serious is not sufficient to satisfy the statute." *Id.* Based on the location of the bullet's entry, both the

paramedic and the doctor treated E.G.'s injury as if it were life-threatening.  However, the CT scan later revealed that the bullet traveled in a straight line without hitting any critical body parts.  For an intrusive gunshot wound, we hold that whether an injury is life-threatening is determined when the path of the bullet and the body parts hit are known.  We therefore conclude that E.G.'s injury was not life-threatening.

In the alternative, the state argues that appellant inflicted injury causing "other serious bodily harm."  Minn. Stat. § 609.02, subd. 8.  We are not persuaded by this argument either.  "Other serious bodily harm" is not defined by statute, and it "should be taken in the context of the other three alternative definitions."  *State v. Moore*, 699 N.W.2d 733, 739 (Minn. 2005).  To determine whether a victim's injuries constitute "other serious bodily harm," courts must consider the totality of the victim's injuries. *See, e.g.*, *State v. Barner*, 510 N.W.2d 202, 202 (Minn. 1993) (concluding that victim's injuries, including swollen head making eating difficult for three days, multiple stab wounds that left scars, and injury to his hand, were encompassed by phrase "other serious bodily harm"); *State v. Anderson*, 370 N.W.2d 703, 706 (Minn. App. 1985) (stating that, "taken as a whole," victim's injuries, including lacerated liver, head laceration requiring stitches, bruises, other head injuries causing lapses of consciousness, and a long scar running length of upper body constituted "other serious bodily harm"), *review denied* (Minn. Sept. 19, 1985).

Here, although a bullet traveled through eight inches of E.G.'s abdomen, it did not hit any critical body parts.  When paramedics arrived, E.G. was able to talk, breathe, and walk to the ambulance with some help.  She was hospitalized, but, after a small incision

7

was made to remove the bullet, she was released the next day. Although this type of injury could leave a permanent lump and causes persistent pain, because E.G. did not testify, the extent of her pain and whether she has any permanent scarring are unknown. Therefore, the evidence does not support a finding that E.G. suffered other serious bodily injury within the meaning of the statute.

The evidence presented at trial, when viewed most favorably to the conviction, does not support a finding that E.G.'s injuries satisfy the statutory definition of great bodily harm and, therefore, is insufficient to sustain appellant's conviction of first-degree assault. As stated in *Gerald*:

> The great bodily harm element as defined by the legislature mandates that we focus on the injury to the victim rather than the actions of the assailant. Although we find it anomalous that an individual who commits a grievous assault on another may escape a first degree assault conviction because the victim is fortunate enough to escape serious injury, we are constrained by the language of the statute.

486 N.W.2d at 802-03. We refrain from speculation about the state's prosecutorial strategy in this particular case, but we note that the result that the state argues is incongruous might be avoided in similar cases by a different charging decision. We reverse and remand for the district court to enter judgment and sentence on second-degree assault. *See State v. LaTourelle*, 343 N.W.2d 277, 284 (Minn. 1984).

## II. Admission of E.G.'s statements to the 911 dispatcher and the police upon their arrival at the scene did not violate the Confrontation Clause.

Appellant argues that the district court erred in admitting E.G.'s statements to the 911 dispatcher and to the officers upon their arrival at the scene. Specifically, he argues that

8

admission of the statements violated his rights under the Confrontation Clause because they were testimonial and E.G. was absent from trial.

Whether the admission of evidence violates a criminal defendant's rights under the Confrontation Clause is a question of law that appellate courts review de novo. *State v. Caulfield*, 722 N.W.2d 304, 308 (Minn. 2006). Both the United States and Minnesota Constitutions guarantee a defendant the right "to be confronted with the witnesses against him." U.S Const. amend. VI; Minn. Const. art. I, § 6. The right to confrontation is violated if testimonial out-of-court statements are admitted into evidence, unless the declarant is unavailable and the defendant has had a prior chance to cross-examine the witness. *Caulfield*, 722 N.W.2d at 308 (citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004)).

Whether a statement is testimonial turns on the primary purpose of the interrogation or questioning. *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 2273-74 (2006). If the primary purpose of the questioning is to enable police assistance to meet an ongoing emergency, the statements are nontestimonial. *Id.* If it is to "establish or prove past events" for purposes of later criminal prosecution, the statements are testimonial. *Id.*

*Davis* cites four factors indicating that a victim's statements were made to meet an ongoing emergency:

> (1) the victim described events as they actually happened and not past events; (2) any "reasonable listener" would conclude that the victim was facing an ongoing emergency; (3) the questions asked and answers given were necessary to resolve a present emergency, rather than only to learn what had

9

happened in the past; and (4) there was a low level of formality in the interview because the victim's answers were frantic and her environment was not tranquil or safe.

*State v. Warsame*, 735 N.W.2d 684, 690 (Minn. 2007) (citing *Davis*, 547 U.S. at 826-27, 126 S. Ct. at 2276-77).

Applying the *Davis* factors to the instant case, we conclude that E.G.'s 911 call and her initial statements to officers were nontestimonial, and thus admissible at trial without her presence. First, both the 911 call and the initial statements to officers were made within minutes of the shooting, while the shooter was still at large in the area. Second, at the time the statements were made, E.G. was in shock, crying, panicky, and appeared to be in significant pain from her recent gunshot wound. Third, the questions asked and answered were designed to address the ongoing emergency and to ascertain E.G.'s physical condition. Notably, the shooter fled the scene still armed with his sister's children. Fourth, the statements were made in a frantic and non-tranquil environment. E.G. was scared and extremely concerned that the shooter would return and hurt her children. Therefore, the district court did not err in concluding that the statements were nontestimonial and admitting them into evidence.

## III. The district court did not plainly err in admitting statements from law enforcement's full interviews of E.G. because appellant "opened the door."

At trial, the district court allowed appellant, after waiving his rights under the Confrontation Clause on the record, to introduce E.G.'s statement to Sergeant Menne that she was "almost positive" Mess shot her, as a prior inconsistent statement under rule 806 of the Minnesota Rules of Evidence. Before this statement was admitted, the district

10

court explained to appellant that, by eliciting E.G.'s statement to Sergeant Menne, appellant was opening the door to E.G.'s entire interview with Sergeant Menne. Further, appellant was opening the door to E.G.'s full interview with Officer Belcourt. The district court reasoned that it was in the interest of fairness and completeness to allow the state to introduce these statements for purposes of rehabilitating E.G.'s credibility. *See* Minn. R. Evid. 806. After the district court's explanation, appellant proceeded to introduce E.G.'s statement to Sergeant Menne as impeachment evidence.

Appellant now argues that the district court erred in allowing the state to question Sergeant Menne and Officer Belcourt about their full interviews with E.G. Specifically, appellant argues that although the state could explore some of the facts and circumstances surrounding the statement appellant admitted as impeachment evidence, beyond that, only prior consistent statements should have been admitted.

We begin by noting that appellant invited any error in the admittance of these statements. "Under the invited error doctrine, a party cannot assert on appeal an error that he invited or that could have been prevented at the district court. The invited error doctrine does not apply, however, if an error meets the plain error test." *State v. Carridine*, 812 N.W.2d 130, 142 (Minn. 2012) (citation omitted). Under the plain-error test, we consider (1) whether there was an error, (2) whether such error was plain, and (3) whether it affected the defendant's substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). An error is plain if it is "clear or obvious." *State v. Strommen*, 648 N.W.2d 681, 688 (Minn. 2002) (quotation omitted). "Usually this is shown if the

11

error contravenes case law, a rule, or a standard of conduct." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006).

Without reviewing whether these statements were admissible under Minnesota Rule of Evidence 806, we conclude that the district court did not plainly err in admitting these statements. Appellant "opened the door" to E.G.'s entire interviews with Sergeant Menne and Officer Belcourt when he introduced E.G.'s statement to Sergeant Menne that she was "almost positive" Mess shot her.

> Opening the door occurs when one party by introducing certain material creates in the opponent a right to respond with material that would otherwise have been inadmissible. The doctrine is essentially one of fairness and common sense, based on the proposition that one party should not have an unfair advantage and that the factfinder should not be presented with a misleading or distorted representation of reality.

*State v. Bailey*, 732 N.W.2d 612, 622 (Minn. 2007) (citations and quotations omitted). If the jury had not been presented with evidence from the entire interviews, they would have been presented with a distorted representation of reality. E.G.'s entire interview with Sergeant Menne could have indicated to the jury that E.G. only told Sergeant Menne that Mess shot her because she was fearful of appellant and was trying to protect him. E.G.'s interview with Officer Belcourt could have indicated to the jury that when E.G. was not being recorded she made consistent statements with those made at the scene, specifically that appellant shot her. Therefore, the district court did not plainly err in admitting these statements.

**IV. The alleged prosecutorial misconduct did not affect appellant's substantial rights.**

Appellant asserts that the prosecutor committed prosecutorial misconduct in his closing argument on three grounds. Because the alleged misconduct was unobjected-to, we review under a modified plain-error standard.[1] *Ramey*, 721 N.W.2d at 299. Under that standard, the defendant must demonstrate error that is plain because it "contravenes case law, a rule, or a standard of conduct." *Id.* at 302. If the defendant is able to make this showing, the burden shifts to the state to demonstrate a lack of prejudice by showing "that there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* (quotations omitted). When considering whether an error had a significant effect on the verdict, we "consider the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions." *State v. Davis*, 735 N.W.2d 674, 682 (Minn. 2007).

First, appellant contends that the prosecutor vouched for E.G.'s credibility, by arguing the following to the jury:

> [E.G.] didn't come in here and tell you that he did this, but we know that he did. She only made one other statement—or she only made a statement that's inconsistent with that one time,

---

[1] Although appellant did not object during closing arguments or request a curative jury instruction, he moved for a mistrial on the third ground after the jury had retired for deliberations. Even if the third ground were considered "objected to" and reviewed under the harmless-error test set forth in *State v. Caron* for more serious misconduct, the prosecutor's conduct here is harmless. 300 Minn. 123, 127, 218 N.W.2d 197, 200 (1974) ("[I]n cases involving unusually serious prosecutorial misconduct this court has required certainty beyond a reasonable doubt that the misconduct was harmless before affirming.").

and that was with the detective sitting there with a recorder, in the hospital, over a day after this happened, after she's had time to think about the possible consequences of telling the police what happened. The night of, when the police arrived, she told them the truth.

Second, appellant claims that the prosecutor inflamed the jury's passions as follows: "Just because she's not here doesn't mean that she doesn't deserve justice. Think about that as you deliberate on this case. Thank you." Finally, appellant asserts that the prosecutor improperly suggested that appellant was to blame for E.G.'s absence at trial, by arguing the following to the jury on rebuttal:

[Defense counsel] also talked about how most lay witnesses don't want to be here. Well, that's true, they don't want to be here. Just like you might not want to be here because of work or school, friends, family, your dog. She didn't want to be here because of him. She didn't want to stand up there and have to have him face her while she tells all of you that he shot her.

Assuming, without deciding, that the prosecutor's comments were plain error, we conclude the state has satisfied its burden of showing that there is no reasonable likelihood that the absence of the misconduct would have had a significant effect on the verdict. *See Ramey*, 721 N.W.2d at 302. The record contains strong evidence of appellant's guilt. E.G. told the 911 dispatcher and the officers at the scene that appellant shot her, appellant's cell phone records indicate that his cell phone was near E.G.'s residence during the shooting, and appellant evaded law enforcement for days after the shooting. Further, the three comments were brief, and appellant's counsel addressed the first two comments during his closing argument when he emphasized that E.G. was not present and when he speculated about the reasons for her absence. Moreover, the district

court instructed the jury twice that the arguments and remarks of the attorneys were not evidence, that the jury should rely on its own recollection of the evidence, and that the jury should disregard attorney statements that were contrary to the statement of the law provided by the court.  Therefore, any error that occurred was harmless.

## D E C I S I O N

Because the CT scan of E.G.'s torso revealed that the bullet did not hit any critical body parts and E.G. suffered only minor injuries, the evidence presented at trial, even when viewed most favorably to the conviction, is insufficient to support a finding that E.G.'s injuries constitute great bodily harm.  Therefore, we reverse appellant's conviction for first-degree assault and remand for the district court to enter judgment and sentence on second-degree assault.  We otherwise affirm because the district court made no evidentiary errors and the alleged prosecutorial misconduct did not affect appellant's substantial rights.

**Affirmed in part, reversed in part, and remanded.**