*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-1355**

Bradford Cain Dopkins, petitioner,
Appellant,

vs.

State of Minnesota,
Respondent.

**Filed June 3, 2024
Affirmed in part, reversed in part, and remanded
Larkin, Judge**

Anoka County District Court
File No. 02-CR-18-3927

Cathryn Middlebrook, Chief Appellate Public Defender, Sean Michael McGuire, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Brad Johnson, Anoka County Attorney, Kelsey R. Kelley, Assistant County Attorney, Anoka, Minnesota (for respondent)

Considered and decided by Larkin, Presiding Judge; Bratvold, Judge; and Frisch, Judge.

**NONPRECEDENTIAL OPINION**

**LARKIN**, Judge

Appellant challenges the postconviction court's denial of his request for relief, in which he claimed that his guilty pleas to first-degree assault and making threats of violence were invalid. Because appellant's guilty plea to first-degree assault lacked an adequate

factual basis and was therefore inaccurate, we reverse in part and remand for further proceedings. However, because appellant has not met his burden to establish that his guilty pleas were unintelligent, we reject his request for relief on that ground. We also reject appellant's additional pro se arguments for relief.

## FACTS

In 2018, respondent State of Minnesota charged appellant Bradford Cain Dopkins with several offenses, including making threats of violence and first-degree assault. During the ensuing criminal proceeding, Dopkins's competency to stand trial was questioned, and at one point, he was found incompetent to stand trial. Ultimately, the district court found Dopkins competent.

Dopkins resolved the charges against him pursuant to a plea agreement with the state. He pleaded guilty to one count of making threats of violence and one count of first-degree assault resulting in great bodily harm. In exchange for those guilty pleas, the state agreed to dismiss the remaining counts, to an executed sentence of 117 months for first-degree assault, and to not seek an aggravated sentence. The district court entered judgment of conviction and sentenced Dopkins to serve 366 days for making threats of violence and a concurrent sentence of 117 months for first-degree assault.

Nearly two years after Dopkins pleaded guilty, he petitioned for postconviction relief, asserting that his guilty pleas were invalid. The postconviction court denied relief without holding an evidentiary hearing.

Dopkins appeals.

2

**DECISION**

Under Minnesota's postconviction statutes, a person convicted of a crime may seek relief by filing a petition claiming that the conviction "violated the person's rights under the Constitution or laws of the United States or of the state." Minn. Stat. § 590.01, subd. 1(1) (2022). "The person seeking postconviction relief bears the burden of establishing by a preponderance of the evidence that his claims merit relief." *Crow v. State*, 923 N.W.2d 2, 10 (Minn. 2019).

We review the denial of a postconviction petition for an abuse of discretion. *Colbert v. State*, 870 N.W.2d 616, 621 (Minn. 2015). In doing so, we review legal issues de novo and factual findings for clear error. *Id.* The postconviction court "abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Nicks*, 831 N.W.2d 493, 503 (Minn. 2013) (quotation omitted).

"A defendant may withdraw a guilty plea after sentencing upon a timely motion and proof to the satisfaction of the court that withdrawal of the plea is necessary to correct a manifest injustice." *State v. Ecker*, 524 N.W.2d 712, 715-16 (Minn. 1994) (quotation omitted) (applying Minn. R. Crim. P. 15.05, subd. 1, in the context of a postconviction challenge to the validity of a guilty plea). A manifest injustice exists if a guilty plea is not valid. *State v. Theis*, 742 N.W.2d 643, 646 (Minn. 2007). To be valid, a guilty plea must be "accurate, voluntary and intelligent." *Ecker*, 524 N.W.2d at 716. "A defendant bears the burden of showing his plea was invalid." *State v. Raleigh*, 778 N.W.2d 90, 94 (Minn. 2010). The validity of a guilty plea is a question of law that this court reviews de novo. *Id.*

3

## I.

Dopkins contends that his guilty plea to first-degree assault was invalid because it was inaccurate. "The main purpose of the accuracy requirement is to protect a defendant from pleading guilty to a more serious offense than he could be convicted of were he to insist on his right to trial." *State v. Trott*, 338 N.W.2d 248, 251 (Minn. 1983). "A proper factual basis must be established for a guilty plea to be accurate." *Ecker*, 524 N.W.2d at 716. To determine whether a guilty plea has an adequate factual basis, "we examine whether there are sufficient facts *on the record* to support a conclusion that defendant's conduct falls within the charge to which he desires to plead guilty." *Lussier v. State*, 853 N.W.2d 149, 154 (Minn. 2014) (quotation omitted).

Dopkins argues that the record does not establish a necessary element of first-degree assault, specifically, great bodily harm. First-degree assault occurs when a person "assaults another and inflicts great bodily harm." Minn. Stat. § 609.221, subd. 1 (2016). An assault includes "the intentional infliction of or attempt to inflict bodily harm upon another." Minn. Stat. § 609.02, subd. 10 (2016). "'Great bodily harm' means bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm." *Id.*, subd. 8 (2016).

Dopkins provided sworn admissions as support for his guilty plea. He admitted that on May 31, 2018, he threatened to harm JS with the intent to make her "very, very afraid." He also admitted that from May 31, 2018, to June 10, 2018, he repeatedly choked JS with his hands until she lost consciousness and physically harmed her by hitting her with a coat

4

hanger. Finally, Dopkins admitted that JS sought treatment for her resulting injuries at a hospital and that the injuries included bruising on her chest, arms, legs, and back, as well as petechia in her eye.

In denying relief, the postconviction court reasoned that Dopkins's guilty plea was accurate because his factual basis established "other serious bodily harm" under section 609.02, subdivision 8:

> The injuries [Dopkins] inflicted on [JS,] including petechiae of the eye, a known sign of occlusion to the airways; repeatedly choking until [JS] lost consciousness over a period of 11 days; and hitting [JS] with a [coat] hanger resulting in substantial bruising over multiple areas of her body all contributed to the [district] court's finding that "other serious bodily harm" had been inflicted on [JS].

Dopkins argues that the record does not show that he inflicted bodily injury that created a high probability of death or other serious bodily harm. We address each form of great bodily harm in turn.[1]

*High Probability of Death*

When determining whether a victim suffered great bodily harm, we must "focus on the injury to the victim rather than the actions of the assailant." *State v. Gerald*, 486 N.W.2d 799, 802 (Minn. App. 1992). For a bodily injury to create a high probability of death, "the injury itself must be life-threatening." *Id.* "The fact that a lesser injury is

---

[1] The record does not suggest, and the state does not argue that the record established, either of the other two types of great bodily harm: "serious permanent disfigurement" or "permanent or protracted loss or impairment of the function of any bodily member or organ." Minn. Stat. § 609.02, subd. 8.

5

located near a major organ or vessel and therefore could have been more serious is not sufficient . . . ." *Id.*

The factual basis for Dopkins's guilty plea includes the following exchange:

> PROSECUTOR: [Dopkins], when you say that you threatened to hurt her, the types of threats that you were making were to hurt her very badly; true?
>
> DEFENDANT: True.
>
> . . . .
>
> PROSECUTOR: As the days went by with [JS], is it true that you physically hurt her in a number of different ways?
>
> DEFENDANT: Yes.
>
> PROSECUTOR: From May 31st through June 10th, [JS] reported that you had choked her on several occasions to the point that she lost consciousness. Is that true?
>
> DEFENDANT: Yes.
>
> . . . .
>
> PROSECUTOR: [Dopkins], are you telling the [c]ourt that every time that you choked [JS] until she became unconscious, you only did it with your hands?
>
> DEFENDANT: Yes.
>
> . . . .
>
> PROSECUTOR: [Dopkins], you don't have to plead guilty today, but what [JS] reported that you did to her is very different from what you're saying today. What is it that you did to her that makes you guilty of first-degree assault?
>
> DEFENDANT: I'm not sure what first[-]degree assault means.
>
> COURT: Well, I can help you with that, [Dopkins].

6

> First[-]degree assault means that you assaulted her[,] and she suffered great bodily harm. And great bodily harm doesn't really have a technical definition so much as it's serious bodily harm.
>
> So the [c]omplaint that I'm reading indicates that [JS] did have to go to the hospital, that her eyes had petechiae . . . , which means, like, a lot of blood visible in her eyes; she had bruises on her body, including on her chest, arms, legs, and back.
>
> So I'm going to ask you, is that the results of your assaulting her?
>
> DEFENDANT: Yes.
>
> COURT: So did you also hit her at some point with a coat hanger?
>
> DEFENDANT: Yes.
>
> COURT: And you agree that you beat her and caused those bruises on her body?
>
> DEFENDANT: Yes.
>
> COURT: The [c]ourt's satisfied that that is great bodily harm . . . .

We turn to caselaw to determine whether Dopkins's factual basis established an injury with a high probability of death.

In *Gerald*, the victim sustained half-inch lacerations on the ear and neck. *Id.* at 801. The state argued that because one of the lacerations was close to a major vein and artery, the victim "could have bled to death." *Id*. at 802. The state further argued that the injury therefore "created a high probability of death" and constituted great bodily harm. *Id.* We rejected the state's argument, reasoning that "[t]he fact that a lesser injury is located near

a major organ or vessel and therefore could have been more serious is not sufficient to satisfy the statut[ory]" requirement of a high probability of death. *Id.*

We reached a similar conclusion in *State v. Dye*, reasoning that a gun-shot injury was not life threatening. 871 N.W.2d 916, 921-22 (Minn. App. 2015). In *Dye*, testimony established that despite the gun-shot injury, the victim could walk, talk, and breathe, and that she walked down a set of stairs to an ambulance. *Id.* at 920. We rejected the state's argument that "a bullet that enters the torso where it did on [the victim] can hit critical body parts, such as the lungs, heart, kidneys, aorta, or spine, and that other patients have died from gunshot wounds in the same area as [the victim's]." *Id.* at 921. We reasoned that although medical staff treated the injury as if it were life-threatening, a CT scan revealed that the bullet traveled in a straight line without hitting any critical body parts. *Id.* In sum, the injury in *Dye* could have been life-threatening for purposes of establishing great bodily harm, but in fact it was not.

In contrast, in *State v. Anderson*, we held that the evidence of the victim's injuries showed a high probability of death and was sufficient to sustain a first-degree assault conviction. 370 N.W.2d 703, 706 (Minn. App. 1985), *rev. denied* (Minn. Sept. 19, 1985). The *Anderson* victim suffered a laceration to her liver, and a physician testified at trial that the laceration was "'life-threatening'" and that it was "'a serious injury because if the bleeding does not stop or is not stopped, a person can bleed and die.'" *Id.* Unlike *Anderson*, the record here does not contain medical evidence indicating that the particular injuries in this case were life-threatening or created a high probability of death.

8

Given the caselaw above, we conclude that the record does not establish that Dopkins inflicted injuries that created a high probability of death. Like the circumstances in *Gerald* and *Dye*, although JS's injuries may have had the potential to be life-threatening, Dopkins did not admit that he inflicted life-threatening injuries and the record does not establish that JS's injuries did in fact create a high probability of death. The record does not contain any information regarding the number of times that Dopkins rendered JS unconsciousness or for how long. Nor does the record contain any medical evidence indicating that JS's injuries created a high probability of death. To be clear, we do not suggest that choking leading to unconsciousness could never create a high probability of death. But caselaw indicates that such a determination must be based on the particular facts of a case. And in this case, the factual record is very weak on that issue. More facts were necessary to show that the injuries that Dopkins inflicted did in fact create a high probability of death.

The state's arguments do not persuade us otherwise. The state argues that JS's loss of consciousness "was because her brain, a major organ was deprived of oxygen, *which is known to lead to death*." (Emphasis added.) That argument is unavailing because, as explained above, the possibility of death is not sufficient to establish great bodily harm. *See Gerald*, 486 N.W.2d at 802 (explaining that "the injury itself must be life-threatening"). The evidence must show that the *particular* injury did in fact create a high probability of death. *See id.* Thus, the state's general assertion that loss of oxygen is known to cause death is not adequate to establish that the particular loss of oxygen in this case created a high probability of death.

9

Moreover, the caselaw on which the state relies is distinguishable. In those cases, courts considered whether a temporary loss of consciousness constitutes "substantial bodily harm" for the purpose of third-degree assault; the courts did not decide that a temporary loss of consciousness constitutes "great bodily harm" for the purpose of first-degree assault. *State v. Stafford*, 340 N.W.2d 669, 670 (Minn. 1983) (declining to decide whether great bodily harm is inflicted if one knocks someone out briefly); *State v. Larkin*, 620 N.W.2d 335, 335 (Minn. App. 2001) ("An individual who assaults another, causing temporary loss of consciousness, has inflicted substantial bodily harm and is guilty of third-degree assault . . . ."). The state does not cite, and we are not aware of, any precedential authority holding that a temporary loss of consciousness constitutes great bodily harm for the purpose of first-degree assault.[2]

*Other Serious Bodily Harm*

"Other serious bodily harm" is not defined by statute, and it "should be taken in the context of the other three alternative definitions." *State v. Moore*, 699 N.W.2d 733, 739 (Minn. 2005). "To determine whether a victim's injuries constitute 'other serious bodily harm,' courts must consider the totality of the victim's injuries." *Dye*, 871 N.W.2d at 922.

In *State v. Barner*, the Minnesota Supreme Court concluded that the following injuries constituted "other serious bodily harm": a swollen head that caused the victim to have difficulty eating for several days, multiple stab wounds that left scars, and a

---

[2] *State v. Lindsey*, which the postconviction court cited, is also not on point. 654 N.W.2d 718, 720 (Minn. App. 2002) (reviewing jury instruction regarding the requisite mental state for the crime of first-degree assault of a correctional employee, which has different elements than the offense here).

10

debilitating injury to the victim's hand. 510 N.W.2d 202, 202 (Minn. 1993). "Other serious bodily harm" was also established in *Anderson*, based on injuries that included a lacerated liver, a head laceration that required stitches, bruises, other head injuries that caused periods of unconsciousness, and a long scar running the length of the victim's upper body. 370 N.W.2d at 706.

In *State v. Jones*, the victim was found unconscious and nearly in shock:

> She had to be put in a "shock suit" for transfer to the hospital. She did not regain consciousness until the following day. She remained hospitalized for a week. She testified that [two] weeks after the attack she almost suffered a miscarriage and was prescribed bed rest. While there was no medical evidence tying this to the attack, it certainly was evidence which the jury could consider in determining whether she had suffered great bodily harm. She testified that her left leg was numb for several weeks, she had dizziness and headaches until just before trial, and she still had a numbness in her teeth at the time of trial.

266 N.W.2d 706, 710 (Minn. 1978). The *Jones* court concluded that, "[a]t the very least, [the victim's] injuries would seem to fit within the phrase '"other serious bodily harm."'" *Id.*

Once again, the record does not contain any information regarding the number of times that Dopkins rendered JS unconscious or for how long. And the record does not contain any medical evidence indicating that JS's injuries compared with those in *Barner*, *Anderson*, or *Jones*. Nor does the record indicate that Dopkins's assault left JS with permanent scars. In sum, the injuries here simply do not compare to the injuries that have supported a finding of "other serious bodily harm."

11

In arguing that the record shows "other serious bodily harm," the state once again relies on *Stafford* and *Larkin*. Again, those cases are not on point because they involved allegations of "substantial," and not "great," bodily harm. *See* 340 N.W.2d at 670; 620 N.W.2d at 335. And the state does not cite any caselaw suggesting that temporary, unmeasured periods of unconsciousness coupled with significant bruising constitutes "other serious bodily harm."

In *Gerald*, we explained that, because the focus of Minnesota's first-degree assault statute is the severity of the victim's injury, there may be situations in which a person who commits a "grievous assault on another may escape a first[-]degree assault conviction because the victim is fortunate enough to escape serious injury." 486 N.W.2d. at 802-03. Those seem to be the circumstances here. The record simply does not establish either an "injury which creates a high probability of death" or "other serious bodily harm" as required to sustain a conviction of first-degree assault.

We do not minimize the harm that Dopkins inflicted. And we recognize that domestic violence is a significant problem that must be treated seriously. But we are bound to follow the law, and caselaw indicates that a determination of great bodily harm must be based on the particular facts of a case. We are also bound by the facts in the record, and in this case, the factual record is weak. More facts are necessary to show that the injuries that Dopkins inflicted did in fact create a high probability of death or constitute other serious bodily harm. Thus, Dopkins's plea to first-degree assault is inaccurate and invalid, and he must be allowed to withdraw his plea to avoid a manifest injustice. *See Theis*, 742 N.W.2d

at 650 (noting that "a manifest injustice exists [when] a guilty plea is invalid," and "withdrawal of the plea [must] be allowed").

## II.

Dopkins also contends that his guilty pleas to first-degree assault and making threats of violence were unintelligent. A guilty plea is intelligent if the defendant understands (1) the charges against him, (2) the rights he is giving up by pleading guilty, and (3) the direct consequences of pleading guilty. *Raleigh*, 778 N.W.2d at 96. A district court must ensure that a defendant has such an understanding before accepting his guilty plea. *See* Minn. R. Crim. P. 15.01, subd. 1 (stating that before a judge accepts a guilty plea, the defendant must be sworn and questioned on whether he or she understands the crime charged and the rights being waived).

Dopkins argues that his guilty pleas were unintelligent because the district court did not verify that he understood his rights or the guilty-plea process. He notes that he repeatedly indicated that he did not understand the charges against him and his most basic trial rights. He argues that the district court "did not ensure that [he] understood the charges, his trial rights [that] he was waiving, and the plea consequences."

The district court's extensive effort to ensure that Dopkins understood the charges, his rights, and the consequences of pleading guilty were accurately summarized by the postconviction court as follows:

> Dopkins'[s] [p]etition focuses on whether [he] adequately understood the rights he waived by pleading guilty. First, Dopkins acknowledged signing a [p]etition to [e]nter [a] [g]uilty [p]lea which enumerated all of his various trial rights. Counsel noted on the record that they had "sat through the glass

13

and talked about everything [in the plea petition], and then [Dopkins] was given a copy." When Dopkins was first questioned about whether he wanted to proceed, he stated "no[,]" and the court immediately recessed and allowed him and his attorneys more time to speak. Upon returning, an amended offer was placed on the record, the court inquired of Dopkins if [he] wished to proceed with the plea[,] and he stated "yes."

When asked if he had any specific questions concerning his rights, Dopkins said "no." The plea hearing transcript spans thirty-eight pages[,] and the last page reflects that court did not conclude until 5:15 p.m., indicating ample time was spent ensuring that he understood everything. While [Dopkins] equivocated during various point[s] during the proceeding about whether he understood specific rights and whether he had read the [r]ule 15 [p]etition, these instances should be viewed in the context of his agreement, upon questioning by counsel, that "we watched you review each page and ultimately sign the last page of the document." Counsel specifically asked Dopkins, "do you recall that?"; to which his response was "yes."

Throughout the hearing, both the court and counsel questioned [Dopkins] repeatedly on whether he wanted to continue with the plea agreement or take the case to trial. The court inquired of [Dopkins] three times whether he wanted to plead guilty and continue through with the plea agreement. Defense counsel asked [Dopkins] twice whether he wished to plead guilty and continue with the plea. Each time, [Dopkins] stated he did not want a trial and confirmed his intentions to plead guilty.

Even though defense counsel went through the [r]ule 15 [p]etition with [Dopkins], and [Dopkins] signed it, inquiry occurred on the record where [Dopkins] acknowledged several specific rights, including the right to challenge how the police did their job and the right to have a jury or court trial. When defense counsel referenced the fact that the [s]tate would have to prove guilt beyond a reasonable doubt, [Dopkins] said "no" when asked if he understood. Defense counsel went on to explain that this was the standard of proof for a jury to unanimously find him guilty. When asked if he had questions about that, Dopkins replied[,] "I don't know." The court then explained further that "beyond a reasonable doubt" was the "highest burden of proof" and reiterated that the burden would

14

be on the [s]tate to prove [him] guilty by proof beyond a reasonable doubt. The court went on to ask[,] "do you understand that's what would happen if we had a trial?" to which Dopkins failed to respond. When he claimed not to understand this explanation, the court responded[,] "Okay. So tell me where your question is. You have to help me out here [so] I can help you, okay?" Dopkins responded[,] "I'm not sure." Later, when Dopkins claimed not to understand what it meant to testify, the court told him[,] "testify simply means you tell what happened under oath, after you've taken an oath to tell the truth. That's what you're doing right now, because I gave you an oath to tell the truth, and you promised me to tell the truth to the best of your ability."

After a long pause, the court noted that Dopkins had signed a [p]etition to [e]nter a [p]lea of [g]uilty, and the court needed to determine what he wanted to do. If he did not want to proceed, the court made it clear that the trial would commence in January.

Defense counsel then picked up questioning Dopkins once again, explaining that testifying was witnesses coming into court and telling the jury "what they know and what they saw[,]" which Dopkins acknowledged with "okay." Counsel then explained that "we as your defense team can present witnesses on your behalf, people who have things to say about you. Do you understand?" He replied[,] "yes." Counsel further explained that he could give up his right to remain silent and testify. But if he pled guilty, there would be no trial.

Dopkins then claimed that he did not want to either plead guilty or have a trial. The court interjected and advised him as follows: "So, [Dopkins], I completely understand that it is difficult to make a decision. But if you decide that you're not going to accept the [s]tate's offer, that is fine, but then you are choosing to have the trial. Do you understand what I am saying?" Dopkins replied, "maybe." The court continued, "do you wish to go forward with the jury trial in January and have all the witnesses testify and have a trial, or do you wish to enter into this agreement that you've signed off on the petition with the [s]tate?" He replied, "the agreement." The court clarified, "so you want to go forward with the agreement. That means you're pleading guilty to these two charges, right?" He replied[,] "right." The court then noted that five other charges in the complaint would be dismissed, which the prosecutor confirmed. In addition, the prosecutor affirmatively stated that

15

the [s]tate would not seek an aggravated sentence and would withdraw its motion for a higher maximum sentence.

The thirty-eight page transcript of the plea hearing demonstrates that [Dopkins] made a knowing, voluntary, and intelligent choice to plead guilty in order to limit his prison time to 117 months and avoid a sentence of up to 20 years. As noted by the court towards the conclusion of the proceedings, counsel "bent over backwards to make sure" Dopkins understood what he was doing. Throughout the lengthy hearing, Dopkins not only reviewed a [r]ule 15 [p]etition thoroughly with his counsel, but he asked many questions in order to have legal concepts and the consequences of his guilty plea explained. As a result, at the conclusion of the proceedings, Dopkins confirmed that he had no other questions. Therefore, the record as a whole demonstrates that Dopkins'[s] guilty plea was accurate, knowing[,] and intelligent. His request to withdraw it must be denied as he has not met his burden to demonstrate that a manifest injustice has occurred.

(Footnotes omitted.)

Although we review the validity of a guilty plea de novo, if a defendant makes inconsistent statements regarding the validity of his guilty plea, "credibility determinations are crucial, [and] a reviewing court will give deference to the primary observations and trustworthiness assessments made by the district court." *State v. Aviles-Alvarez*, 561 N.W.2d 523, 527 (Minn. App. 1997), *rev. denied* (Minn. June 11, 1997).

The district court's obligation to ensure that Dopkins's guilty pleas were intelligent was complicated by Dopkins's inconsistent statements regarding his understanding of the charges, his rights, and the consequences of his guilty pleas. The district court's ultimate acceptance of Dopkins's guilty pleas, as well as the same judge's subsequent rejection of his postconviction claim that his guilty pleas were unintelligent, inevitably depended on the district court's resolution of his inconsistent statements and an assessment of his

16

credibility. We defer to the court's implicit determination that despite Dopkins's inconsistent and equivocal statements, Dopkins understood the charges against him, the rights he was giving up by pleading guilty, and the direct consequences of pleading guilty. We therefore conclude that his guilty pleas were intelligent.

In conclusion, because the factual basis for Dopkins's guilty plea to first-degree assault was inaccurate, we reverse and remand in part for Dopkins to withdraw his guilty plea to that offense. However, because Dopkins has not met his burden to establish that his guilty pleas were unintelligent, and we are not persuaded that his remaining pro se arguments provide a basis for relief, we affirm in all other respects. *See Ture v. State*, 681 N.W.2d 9, 20 (Minn. 2004) (rejecting pro se arguments after thorough review of the record and without detailed discussion).

**Affirmed in part, reversed in part, and remanded.**